[File No. 6412.]

STATE OF NORTH DAKOTA UPON THE RELATION OF THE BOARD OF RAILROAD COMMISSIONERS OF THE STATE OF NORTH DAKOTA, as Trustee for J. C. Schleicher, Doing Business as the Schleicher Elevator, an Insolvent Warehouseman, Appellant, v. BURT STATE BANK, a Corporation, Respondent.

(270 N. W. 91.)

Opinion filed November 13, 1936.   Rehearing denied December 12, 1936.

*J. A. Heder,* and *W. H. Stutsman,* for appellant.
*Jacobsen & Murray,* for respondent.

Burr, J.   This case was remanded to the district court for the taking of testimony on two issues: "What do the books and records of the defendant show regarding the alleged settlement made by Schleicher for the money furnished on the dishonored $3,000 draft drawn on the Tenney Company?   And what do these records of the bank show regarding the arrangements made with the warehouseman for financing his operations during the period between November 11, 1930, to the closing of the elevator on February 21, 1931?   Other testimony on these two issues may be supplied by either party."
This was the order.   See 66 N. D. 529, 267 N. W. 337, where some of the facts are set forth.

The district court made additional findings.   Regarding the alleged settlement with defendant for the money furnished on the dishonored

$3,000 draft drawn on the Tenney Company the court found that settlement was in fact made as found before, and, therefore, the bank was paid in full. With reference to this the counsel for the plaintiff stated at the hearing, "I think the court can safely report to the Supreme Court that on that his findings are as they were before." The trial court, therefore, was justified in finding that the grain in dispute was not taken by the bank in order to reimburse itself for the amount advanced on the draft.

However, this does not dispose of the main issue. This is an action in conversion. It is clear from the books of the elevator that when the elevator closed the warehouseman was hopelessly insolvent, and, as pointed out in the former opinion, there was a shortage of almost 10,000 bushels of wheat to meet the outstanding storage tickets. The books of the elevator also showed the shipment of this grain in the name of the bank of which the warehouseman was vice-president and director. These books were apparently in the usual form and there is nothing therein to indicate in any way that the wheat shipped was not from the common mass taken in by the warehouseman in the ordinary course of business—in fact, the books indicate that this shipment came from the common mass. The bank admits the grain was shipped in its name and the evidence shows it received the proceeds of the sale. Clearly the plaintiff has established a prima facie case to substantiate its theory of conversion. This required the defendant to introduce evidence to show its title to the grain. If the grain was not taken to reimburse itself for loss on the Tenney draft, why was the bank buying grain?

It is the contention of the defendant that because of the financial difficulties in which the warehouseman was placed, it agreed to assist him by having his purchases of grain made in the name of the bank, specially binned for the bank, paid for by the bank, and shipped to reimburse it. The evidence showed when the bank was solicited by the warehouseman to aid him in his difficulties, it first consulted counsel, and thereafter this plan was evolved. If the warehouseman bought the grain for the bank, kept it in special bins and apart from the common mass, and the bank paid for the grain, then the grain belonged to the bank and plaintiff is not entitled to it. The warehouseman swears that this was the arrangement. There is nothing on the

books of the elevator to indicate any such arrangement and the warehouseman admits the elevator has no such record.

The testimony of the warehouseman is quite uncertain. It is true the transactions took place several years ago; but there are manifest discrepancies in the testimony given by him on the two different hearings. It is extremely difficult to ascertain just when the so-called special binning took place; but the warehouseman states that it was after Tenney Company ceased to finance him and this seems to be admitted to be the 10th or 11th of November. The testimony furnished by the defendant shows no claim that there was any special binning after the shipment of this grain on November 17 and 18. These facts also were indicated on the first hearing; but as the elevator did not close until the latter part of February, 1931, it became important to determine how the warehouseman was financed after November 11.

There is nothing in the record to show any other indebtedness to the bank from Schleicher or from the elevator company. There is no claim that the grain shipped out in the name of the bank was grain raised by the bank, nor grain that was received from debtors of the bank in payment of their debts, nor is there anything to indicate Schleicher was paid for his services in handling grain for the bank.

The coincidences of the credit furnished by the $3,000 draft and the shipment of a little over $3,000 worth of wheat shortly thereafter, together with the testimony indicating that there was no special binning until the time of the trouble over the draft and that it ceased immediately after the shipment of enough grain to pay for the draft, rendered the testimony furnished on the first hearing so unsatisfactory that this court required examination of the records to find how the warehouseman was thereafter financed.

With reference to this proposition the trial court found "that between November 11, 1930, and February 21, 1931, the said J. C. Schleicher and the said bank and certain commission firms entered into arrangements wherein and whereby the said Schleicher would ship grain to these certain commission firms and draw drafts for the approximate and estimated amount of the grain and cash same thru said bank and the said commission firms honored and paid said drafts;

that said bank honored and paid checks issued by the said warehouseman to farmers for the purchase of such grain; that this system had no relation to or nothing to do with the grain purchased by the bank and put in special storage; . . . ."

This finding is sustained by the evidence and thereafter the warehouseman did business in his wife's name.

It is true there were no records of the bank furnished showing the payment of one dollar for this wheat and the warehouseman, who is now the cashier, testified that he made.a search through the records and could find none. His explanation is that no records were kept. He testified in effect that when the producer brought in grain he put it in this special bin, gave the farmer a slip showing the amount of grain and its value, which slip was taken to the bank by the producer and the amount stated therein paid. When the grain was shipped out and the money received from the commission houses for these four carloads of grain, the slips were of no further value and were not preserved. The testimony of the warehouseman would indicate that this method kept up for ten or eleven days and by that time he had made arrangements with the other commission houses and therefore there was no further reason for the bank to finance him.

While the testimony is uncertain and vague, and while the main witness, the warehouseman, is very indefinite as to dates and times and methods, nevertheless we must not overlook the fact that this is an action in conversion where a jury was waived, the case tried to the court, and the judge made his findings in favor of the defendant. In other words, the court found that despite uncertainties the plaintiff has not proved its title to this grain, that the explanation given by the defendant is sufficiently fair on its face to destroy whatever would be the effect of the prima facie case made by the plaintiff, and, therefore, that the action should be dismissed.

The findings of the trial court in this case are entitled at least to appreciable weight. See Jones v. Grady, 66 N. D. 479, 266 N. W. 889, 892. On both hearings the trial judge found for the defendant. The books of the bank that were produced he had before him. He saw the witnesses and, as has been stated frequently, he had the benefit of the atmosphere of the trial. It cannot be said there is not testimony

to sustain his decision. All in all, we are constrained to arrive at the same conclusion, and, therefore, the judgment is affirmed.

BURKE, Ch. J., and CHRISTIANSON and MORRIS, JJ., concur.

NUESSLE, J., dissents.